# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CONSTELLATION NEWENERGY, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as receiver for Washington Mutual Bank,**<br><br>Defendant. | **Civil Action 10-00310 (HHK)** |

## MEMORANDUM OPINION AND ORDER

Plaintiff Constellation NewEnergy, Inc. ("NewEnergy") brings this action against the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as the Receiver of Washington Mutual Bank, asserting claims of breach of contract, unjust enrichment, and promissory estoppel arising out of the FDIC's repudiation of contracts with NewEnergy. Before the Court is the FDIC's motion to dismiss NewEnergy's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [#16]. Upon consideration of the motion, the opposition thereto, and the record of the case, the Court concludes that the motion should be denied.

## I. BACKGROUND

NewEnergy is an energy company that supplied electric power to Washington Mutual Bank at various locations. On September 25, 2008, the Office of Thrift Supervision ordered Washington Mutual Bank closed, and the FDIC was appointed as its Receiver. As the Receiver, the FDIC disaffirmed certain of Washington Mutual Bank's contracts, including its electric power contracts with NewEnergy. *See* 12 U.S.C. § 1821(e) (giving an appointed receiver the

authority to repudiate or disaffirm contracts determined to be burdensome where repudiation or disaffirmance promotes the orderly administration of the institution's affairs); Am. Compl., Ex. 4.[1] NewEnergy timely asserted an administrative claim for costs and damages arising out of this alleged breach of contract. Am. Compl., Ex. 5. The FDIC rejected NewEnergy's claim on the ground that liability for the claim had passed to JPMorgan Chase, which purchased Washington Mutual Bank's assets from the FDIC. *Id.*, Ex. 6. NewEnergy subsequently filed this action.

## II. ANALYSIS

The FDIC moves to dismiss NewEnergy's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that NewEnergy was in privity with Washington Mutual, Inc., not Washington Mutual Bank,[2] and therefore the FDIC, as Receiver for the latter, cannot be held liable for breach of contract.[3] The FDIC's position cannot be sustained for the reasons that follow.

---

[1] Exhibit 4 contains letters dated June 1, 2009 and July 27, 2009 from the FDIC informing NewEnergy of its decision to disaffirm Washington Mutual Bank's electric power contracts with NewEnergy "to the full extent, if any, that [each contract] represents an enforceable obligation of [Washington Mutual Bank] or the Receiver." Am. Compl., Ex. 4 at 1, 3.

[2] Washington Mutual Bank was a subsidiary of Washington Mutual, Inc. prior to its closure by the Office of Thrift Supervision.

[3] Under Rule 12(b)(6), a court must dismiss a complaint or any portion thereof that fails to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). In assessing the sufficiency of the complaint, a court may treat exhibits attached to a complaint as part of that pleading. FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

There are three agreements that are at issue in this case.[4]  First, there is an agreement between Washington Mutual, Inc. ("WMI") and NewEnergy that is "intended to be a master agreement between the Parties pursuant to which from time to time the Parties execute and deliver separate electricity supply agreement(s) (each an 'ESA') and related pricing schedule(s) (each, a 'Pricing Schedule'), with such ESAs and Pricing Schedules deemed incorporated herein and constituting a part of this Agreement."  Am. Compl., Ex. 1 ("Master Agreement") at 1.[5]  Additionally, there are two Pricing Schedules executed between Washington Mutual Bank and NewEnergy, each dated March 20, 2008, that set forth the specific charges and terms under which NewEnergy will provide electric power.  *Id.*, Ex. 2 ("Pricing Schedule 1"); *Id.*, Ex. 3 ("Pricing Schedule 2").  Each Pricing Schedule states that it was "entered into pursuant to and in accordance with the . . . Master Agreement . . . and is subject to all of the provisions, terms and conditions of such Master Agreement."  Pricing Schedule 1 at 1; Pricing Schedule 2 at 1.

The FDIC argues that the three agreements comprise a single contract.  Consequently, because the only parties to the Master Agreement are NewEnergy and WMI, the proper party to any contract action brought by NewEnergy is WMI.  In support of its argument, the FDIC points to Paragraph 24 of the Master Agreement.  Paragraph 24(a) states that NewEnergy "will provide the service contemplated by this Agreement to Washington Mutual, Inc. and any other member of the Washington Mutual Group designated by Customer, irrespective of its corporate

---

[4] These three agreements were filed under seal as attachments to NewEnergy's Amended Complaint.  The Court quotes from the agreements only where the parties have already done so in their public filings.

[5] The Master Agreement is to be interpreted according to the laws of the State of New York.  *See* Master Agreement ¶ 16.

3

structure[.]" Master Agreement ¶ 24(a). The FDIC asserts that the member of the Washington Mutual Group so designated under the Pricing Schedules in Exhibits 2 and 3 is Washington Mutual Bank. Paragraph 24(d) of the Master Agreement provides:

> It is hereby agreed and acknowledged by the Parties that the obligations of Customer under this Agreement are the obligations only of Customer and that none of the other Washington Mutual Group companies, including Washington Mutual Bank, Washington Mutual Bank FA and Washington Mutual Bank fsb, will be responsible for the obligations of Customer under this Agreement. Each representation, warranty and covenant made by Customer under this Agreement is made by, or on behalf of, and with respect to, Customer only, and not any other Washington Mutual Group Company.

Master Agreement ¶ 24(d). Thus, the FDIC reads the Master Agreement to indicate that NewEnergy agreed to provide service to members of the Washington Mutual Group, including Washington Mutual Bank, but to look only to WMI for payment for those services. The FDIC asserts that any other reading would render paragraph 24 of the Master Agreement nugatory.

NewEnergy responds that it does not assert its breach of contract claim under the Master Agreement, but instead under the Pricing Schedules. NewEnergy points out that it and Washington Mutual Bank are the signatories to the two Pricing Schedules.[6] These Schedules define the "Customer" as Washington Mutual Bank, and each one is signed by a representative of Washington Mutual Bank. Pricing Schedule 1 at 1, 6; Pricing Schedule 2 at 1, 6. These

---

[6] NewEnergy points to the FDIC's letters disaffirming the contracts between Washington Mutual Bank and NewEnergy to argue that the FDIC has admitted that Washington Mutual Bank is a party to the disaffirmed Schedules. The letters identify the Pricing Schedules in Exhibits 2 and 3 as the contracts being disaffirmed. Am. Compl., Ex. 4 at 1, 3. The letters, however, state that "the Receiver has elected to disaffirm the above referenced contract to the full extent, *if any*, that it represents an enforceable obligation of the Institution or the Receiver." *Id.* (emphasis added). Thus, the letters expressly speak to the possibility that Washington Mutual Bank had no enforceable interest in the identified contracts. Accordingly, the FDIC's letters disaffirming the contracts between Washington Mutual Bank and NewEnergy do not constitute a concession that Washington Mutual Bank was a party to the contracts.

Schedules provide that Washington Mutual Bank, as the Customer, is liable for the financial obligations of the Schedule, stating that "[u]tility charges for distribution services and any applicable taxes or surcharges . . . shall be the sole financial responsibility of Customer[.]" Pricing Schedule 1 at 1; Pricing Schedule 2 at 1. The Schedules further state that the "Customer shall pay the NewEnergy Electricity Charge. In addition to the NewEnergy Electricity Charge, Customer shall pay and be responsible for all such other amounts related to the purchase and delivery of electricity[.]" Pricing Schedule 1 at 2; Pricing Schedule 2 at 2.[7] The Court agrees with NewEnergy that the agreement embodied in each Pricing Schedule is an obligation enforceable against Washington Mutual Bank.

The language in the Master Agreement and the Pricing Schedules indicates that these agreements should be read together. Doing so, however, presents challenges. WMI is the designated "Customer" and signatory to the Master Agreement, while Washington Mutual Bank is the "Customer" and signatory to the Pricing Schedules. The Master Agreement appears to contemplate an agreement wherein WMI is responsible for payment for NewEnergy's services provided to all members of the Washington Mutual Group, including Washington Mutual Bank. The Pricing Schedules, however, assign sole responsibility for payment for NewEnergy's services to Washington Mutual Bank.

Under other circumstances, the Court might have more difficulty determining how to enforce these inconsistent provisions so as to effectuate the parties' intent. But here, the parties have expressly provided for this situation. Both the Master Agreement and the Pricing Schedules

---

[7] This latter statement technically comes from the part of the Pricing Schedule deemed the electricity supply agreement ("ESA"). The distinction between the ESA and the Pricing Schedule is not relevant to the adjudication of the FDIC's motion to dismiss.

state that, in the event of any conflict between the Master Agreement and the Pricing Schedule, the terms of the Pricing Schedule will govern. *See* Master Agreement § 19 ("In the case of any conflict among the documents comprising the Agreement, they will control in the following order of priority: first, the applicable Schedule A [Pricing Schedule] . . . ; second, the applicable ESA; third, these General Terms and Conditions [of the Master Agreement]."); Pricing Schedule 1 at 1 ("[A]ny conflict between this Pricing Schedule and the Master Agreement will be resolved in favor of this Pricing Schedule."); Pricing Schedule 2 at 1 (same). The Pricing Schedules indicate that Washington Mutual Bank entered into an express agreement with NewEnergy to be liable for payment for electric power supplied by NewEnergy under the Schedules. To the extent that such an agreement conflicts with the limitation of liability provision in paragraph 24(d) of the Master Agreement, the terms of the Pricing Schedules control.

Therefore, the FDIC's argument that NewEnergy should have sued WMI instead of Washington Mutual Bank must be rejected.[8] By signing the Pricing Schedules, Washington Mutual Bank agreed to be bound by their terms. *Da Silva v. Musso*, 428 N.E.2d 382, 386 (N.Y. 1981) ("Under long accepted principles[,] one who signs a document is . . . bound by its contents."). Further, the parties' conduct conforms to this understanding; NewEnergy billed

---

[8] Notably, the FDIC rejected NewEnergy's original claim against the FDIC as the receiver for Washington Mutual Bank on the grounds that "[t]his is a liability that has passed to JPMorgan Chase pursuant to the Purchase and Assumption Agreement." Am. Compl., Ex. 6. Although this statement was not a binding admission that a contract existed between Washington Mutual Bank and NewEnergy, it indicates that a judicial determination to that effect would not be contrary to the reasonable expectations of Washington Mutual Bank and the FDIC. *Cf. Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977) ("Generally, the aim is a practical interpretation of the expressions of the parties to the end that there be a 'realization of [their] reasonable expectations.'" (quoting 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1) (alteration in original).

Washington Mutual Bank, not WMI, according to the terms of the Pricing Schedules. *See* Am. Compl., Ex. 5;[9] *Ahlstrom Mach. Inc. v. Associated Airfreight, Inc.*, 272 A.D.2d 739, 741 (N.Y. App. Div. 2000) ("In determining whether a party entered into a binding contract, courts . . . look to objective manifestations of intent as established by words and deeds.") (internal quotation marks, citation, and emphasis omitted). Accordingly, the FDIC's motion to dismiss will be denied.[10]

### III. CONCLUSION

For the foregoing reasons, it is this 24th day of March 2011 hereby

**ORDERED** that defendant's Motion to Dismiss Plaintiff's Amended Complaint [#16] is **DENIED**.

Henry H. Kennedy, Jr.<br>
United States District Judge

---

[9] Exhibit 5 contains NewEnergy's letters to the FDIC asserting its administrative claims for damages. Am. Compl., Ex. 5. Copies of outstanding invoices are attached, which confirm that NewEnergy billed Washington Mutual Bank for its services.

[10] Because the Court finds that a contract existed between Washington Mutual Bank and NewEnergy, the Court does not address the parties' arguments regarding NewEnergy's alternative claims for relief under theories of quasi-contract. Under New York law, "[w]here the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009).